## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

**DAVID BRUCE SPIZER,**

### PLAINTIFF

**VERSUS**                                    **CIVIL ACTION NO.**

**MARK E. MORICE, individually and in his capacity as a reserve deputy with Plaquemines Parish Sheriff's Office, MORICE LAW FIRM, LLC, DET. ROGER CAILLOUET, individually and in his official capacity as a police officer with New Orleans Police Department, CAPT. TY WILTZ, individually and in his official capacity as a deputy with Plaquemines Parish Sheriff's Office, DOUGLAS S. HAMMEL, THE HAMMEL LAW FIRM, LLC, THE CITY OF NEW ORLEANS, GERALD A. TURLICH, JR., in his official capacity as Sheriff of Plaquemines Parish, GILSBAR, L.L.C., and CONTINENTAL CASUALTY COMPANY,**

**SECTION**

**MAGISTRATE**

### DEFENDANTS
**********************************************************************

### <u>VERIFIED COMPLAINT</u>

**NOW COMES PLAINTIFF**, David Bruce Spizer, through undersigned counsel and for his complaint against Defendants, avers upon information and belief as follows:

### <u>I. NATURE OF THE ACTION</u>

1.      David Bruce Spizer files this complaint for the violation of his civil rights, the violation of federal law by individuals acting under the color of law, and violations of state law, including defamation, abuse of process, abuse of right, intentional infliction of emotional distress, malicious prosecution, general tort liability and vicariously liability against the parties made Defendants hereby and identified in Paragraph 10.

2.     Plaintiff is a New Orleans attorney whose civil rights were violated by individuals acting under the color of law and who has suffered severe and permanent damage to his otherwise unblemished reputation.

3.     Mark E. Morice and some of the Defendants—law enforcement officers and licensed attorneys—violated federal law to obtain the Plaintiff's name and information. This information, as if picked from a hat, enabled Morice to groundlessly assail the Plaintiff with accusations of stalking and harassing a man that the Plaintiff did not know existed.

4.     Ultimately, Morice conceded that the Plaintiff had done nothing of the sort. But the damage had already been done. Backed into a corner, Morice doubled-, tripled-, and quadrupled-down, all the while trouncing on federal and state law. The Plaintiff's civil rights were trampled as well, and his reputation was irreparably damaged without a scintilla of justification. He now seeks relief.

## II. JURISDICTION AND VENUE

5.     The first count of this action arises under 42 U.S.C. § 1983. This Honorable Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

6.     The second count of this action arises under the Driver's Privacy Protection Act - 18 U.S.C. §§ 2721-2725. This Honorable Court has jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 2724.

7.     The third, fourth, fifth, sixth, seventh, eighth, and ninth counts of this action arise under Louisiana law. This Honorable Court has supplemental jurisdiction under 28 U.S.C. § 1367 because each of these claims are "so related to claims in the action within such original jurisdiction that [it] form[s] part of the same case or controversy under Article III of the United States Constitution."

2

8.     Venue is proper in this Honorable Court under 28 U.S.C. § 1391(b)(2) because this Court is in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

### III. PARTIES

9.     Made Plaintiff hereby, David "Bruce" Spizer ("Spizer") is a resident of the Parish of Orleans, State of Louisiana, an attorney authorized to practice law in the State of Louisiana.

10.     Made Defendants hereby, are:

(a)     **Mark E. Morice**, individually and as a reserve deputy with the Plaquemines Parish Sheriff's Office, an attorney authorized to practice law in the State of Louisiana, and a resident of the Parish of Orleans, State of Louisiana;

(b)     **Morice Law Firm, LLC**, a Louisiana limited liability company domiciled in the Parish of Jefferson, State of Louisiana, whose manager and sole member is Mark E. Morice;

(c)     **Roger Caillouet**, a detective with New Orleans Police Department and believed to be a resident of the Parish of Jefferson, State of Louisiana;

(d)     **Ty Wiltz**, individually and as a captain with the Plaquemines Parish Sheriff's Office and believed to be a resident of the Parish of Plaquemines, State of Louisiana;

(e)     **Douglas S. Hammel**, an attorney authorized to practice law in the State of Louisiana and a resident of the Parish of Orleans, State of Louisiana;

(f)     **The Hammel Law Firm, LLC**, a Louisiana limited liability company domiciled in the Parish of Jefferson, State of Louisiana, whose sole member is Douglas S. Hammel;

(g)     **The City of New Orleans**, a municipality within the Parish of Orleans, State of Louisiana and employer of Det. Roger Caillouet, which is vicariously liable for his actions under color of state law in the course and scope of his employment as to the state law claims;

(h)     **Sheriff Gerald Turlich, Jr.**, in his capacity as Sheriff of Plaquemines Parish and employer of Ty Wiltz and Mark E. Morice,

3

who is vicariously liable for their actions under color of state law in the course and scope of his employment as to the state law claims;

(i)   **Gilsbar, L.L.C.,** a Louisiana limited liability company domiciled in the Parish of St. Tammany, State of Louisiana, whose members are believed to be domiciliaries of St. Tammany Parish, State of Louisiana; and

(j)   **Continental Casualty Company, Inc.,** a subsidiary of CNA, a corporation domiciled in Chicago, Illinois.

## IV. FACTUAL ALLEGATIONS

*A. THE POOL CASE*

11.    Heidi Nuss ("Nuss") and Mark E. Morice ("Morice") are a married couple owning property and residing at 6833 General Diaz Street in the Lakeview Neighborhood of New Orleans, Louisiana (the "General Diaz Property").[1]

12.    Nuss and/or Morice hired Ladner's Industries Co., d/b/a Ladner's Pools ("Ladner's") to construct a swimming pool in the back yard of the General Diaz Property.

13.    There was a disagreement between Ladner's, on the one hand, and Morice and/or Nuss, on the other hand, and litigation ensued.

14.    That litigation, captioned *Heidi Nuss v. Ladner's Industries Corporation, d/b/a Ladner's Pools, Theodore "Ted" Ladner, Jr., et al*, No. 2018-11691, in the Civil District Court for the Parish of Orleans, State of Louisiana (hereinafter, the "Pool Case"), was the catalyst of all events giving rise to the instant suit.

15.    Nuss, the Plaintiff in the Pool Case, was represented by Morice.

16.    Ladner's, the Defendant in the Pool Case, was represented by Sarah A. Whalen ("Whalen").

---

[1] Mark E. Morice maintains that the property is the separate property of Heidi Nuss.

**B. MARK E. MORICE**

17.     Morice is an attorney authorized to practice law in the State of Louisiana.

18.     Morice practices with the "Morice Law Firm, L.L.C."

19.     Morice holds himself out as a reserve deputy of the Plaquemines Parish Sheriff's Office (the "PPSO").

20.     Although he apparently is not compensated, Morice has received Peace Officer Standards and Training (POST) certification from the PPSO.

21.     The PPSO lists Morice as a full-time employee in records filed with the State of Louisiana even though he is not and receives no compensation from the PPSO.[2]

**C. SARAH A. WHALEN**

22.     Whalen is an attorney authorized to practice law in the State of Louisiana.

23.     In connection with her representation of Ladner's Pools, Whalen drove on public roads and walked on a public sidewalk and alley near the General Diaz Property to photograph the backyard pool area, which was viewable from public vantage points without obstruction.

24.     Whalen used a small handheld camera to photograph the General Diaz Property from the sidewalk and alley. At no time did Whalen set foot on the General Diaz Property.

25.     After taking these photographs, Whalen drove by the General Diaz Property as she was leaving the neighborhood and was confronted by Morice, who positioned himself in front of her slow-moving vehicle and pointed the palm of his hand towards her as if ordering her to stop as a policeman would do.

26.     From this position, Morice photographed and/or filmed Whalen, who had stopped her vehicle and remained inside with the windows up and the doors locked.

---

[2] In his deposition in the Pool Case, Morice testified that he works approximately 20 hours a month for the PPSO and is a legal advisor for the PPSO.

27.     When Whalen thought it safe to move her vehicle, she drove a few blocks to Marshall Foch Street and parked her vehicle to find her inhaler and call her client, Ted Ladner. Morice then drove up in his vehicle and stopped it parallel to Whalen's vehicle, effectively blocking her from safely moving her car. It is believed that during this encounter, Morice called 911 (the "911 Call"). After Morice moved his car, Whalen, then unaware a 911 Call had been made, peaceably drove away before any law enforcement arrived and before any interaction with Morice.

### D. THE 911 CALL

28.     On April 24, 2019, at approximately 6:29 p.m., Morice made the 911 Call to report a "suspicious person" "who [was] parked out front of [his] house," and who then came around the block and parked in the 6800 block of Marshal Foch Street.

29.     According to the 911 Call transcript,[3] Morice gave the 911 operator a description of the vehicle, including its **license plate number**. Morice indicated that the person in the vehicle was a **white female who appeared to be in her late 50s or 60s**. Morice further indicated that the person had a camera with a zoom lens and was taking pictures of his yard and house.

30.     When asked by the 911 operator if any weapons were involved or mentioned, Morice replied, "No ma'am, not that I'm aware of." When asked by the 911 operator if he or anyone else was in danger, Morice replied, "I don't believe so." Morice told the 911 operator, "**I know there is a Lakeview police officer that we pay out here**."

31.     The 911 operator told Morice "[d]o not approach the person or the vehicle" and that an officer would be dispatched and to call back immediately if anything changed before the officers arrived. Morice did not make any further calls to 911 that evening.

---

[3] Attached hereto as Exhibit A.

32.     The **white female** reported by Morice was Whalen.

## E. THE POLICE RESPONSE

33.     In response to the 911 Call, the New Orleans Police Department (the "NOPD") dispatched Officer Joseph Maher and Officer Roy Shackelford to the 6800 block of Marshal Foch.

34.     NOPD Det. Roger Caillouet ("Det. Caillouet"), **who was not dispatched to the scene**, arrived at the Marshal Foch location **before** Officer Maher and Officer Shackelford.

35.     Upon information and belief, Det. Caillouet is the individual described by Morice in the 911 Call as the "Lakeview police officer that we pay out here" (*see* Paragraph 30, above) and was on detail duty at the time.

36.     Upon information and belief, Morice contacted Det. Caillouet separately from the 911 Call and requested his assistance.

37.     Det. Caillouet arrived at the Marshal Foch location before the officers dispatched by the NOPD.

38.     The audio/video body camera recordings of Officers Maher and Shackelford indicate that they disabled the audio recording upon their arriving on the scene.

39.     These recordings show the driver of the police vehicle speaking with someone, who, upon information and belief, is Det. Caillouet.

40.     After the conversation, the audio was turned back on and the officers drove away.

41.     It appears from the recordings that Det. Caillouet advised the dispatched officers that he would handle the matter even though he had not been dispatched to the scene by the NOPD.

## F. THE LICENSE PLATE LOOKUP

42.     Morice and Det. Caillouet's discussion regarding the incident ultimately caused Det. Caillouet, acting under color of state and local law, to run the license plate of the vehicle

described by Morice through the motor vehicle database available to Det. Caillouet as a law enforcement officer (the "License Plate Lookup").

43.    Upon information and belief, Morice's status as a reserve deputy of the Plaquemines Parish Sheriff's Office influenced Det. Caillouet to carry out the License Plate Lookup as a favor to a fellow law enforcement officer.

44.    Although Det. Caillouet did not file an incident report, he filed a supplemental report that indicates he conducted the License Plate Lookup for the license plate of vehicle described by Morice.

45.    The purpose for the License Plate Lookup provided by Det. Caillouet in the supplemental report was that the vehicle was involved in a "hit and run."

46.    No "hit and run" had occurred.  Det. Caillouet provided this wrong justification with full knowledge of its falsity.

47.    The vehicle registration information obtained by Det. Caillouet from the License Plate Lookup indicated that the vehicle was owned by Whalen and Spizer.

### G. DAVID BRUCE SPIZER

48.    Spizer, the Plaintiff herein, and Whalen are unmarried romantic partners.

49.    Spizer purchased the vehicle as a gift for Whalen, his girlfriend.

50.    Spizer's name appears on the title only because he is financing the vehicle.

51.    Spizer's designation as a co-owner of the vehicle was the only information that Morice used to institute legal proceedings against Spizer and accuse him of stalking, harassing, and intimidating Morice and his family.

52.    Spizer has never driven Whalen's vehicle. Spizer has never been listed as an insured for the vehicle. In fact, Spizer has only physically been in the vehicle a few times—on occasions

when Whalen drove him to and from the airport.

### H. THE CITIZEN'S COMPLAINT

53.     On or about May 2, 2019, Whalen called PPSO to file a citizen's complaint against Morice, in his capacity as a reserve deputy of PPSO, for his conduct on April 24, 2019, when he used law enforcement gestures to detain her vehicle in the public street outside of the General Diaz Property so that he could walk around her vehicle while photographing and/or filming her.

54.     Whalen spoke with PPSO Detective Ty Wiltz ("Capt. Wiltz") and described her encounter with Morice. Capt. Wiltz assured her that he would investigate the matter.

55.     Upon information and belief, Whalen's conversation with Capt. Wiltz was recorded by Wiltz and the PPSO.

56.     Upon information and belief, Capt. Wiltz, acting under color of state and local law in his official capacity as a detective with the PPSO, discussed Whalen's call with Morice.

57.     Further, upon information and belief, Capt. Wiltz or another employee of PPSO, acting under color of state and local law, gave Morice access to and/or a copy of the recording of Whalen's telephone conversation with Capt. Wiltz. There is no legal basis or other justification supporting Capt. Wiltz's disclosure of his conversation with Whalen. Upon information and belief, the information was provided as an improper "professional courtesy" to Morice, an employee of the PPSO. Simply put, Capt. Wiltz and/or the PPSO were colluding with Morice in an effort to avoid an honest, full and genuine investigation into Whalen's citizen's complaint.

58.     Tellingly, Whalen has not been provided with a recording or transcript of her telephone conversation with Capt. Wiltz despite the issuance of a subpoena to the PPSO by Whalen's attorneys. The PPSO continues to protect its employee, Morice, from the consequences of his alleged wrongdoing.

## H. THE MORICE T.R.O.

59.     On May 3, 2019, Morice¸ in his capacity as a Louisiana lawyer,[4] signed and filed a *Motion for Temporary Restraining Order and Preliminary Injunction* in *Mark E. Morice v. Sarah A. Whalen a/k/a Sarah Rumage and David Bruce Spizer and Ladner's Industries Corp d/b/a Ladner's Pools and Theodore A. "Ted" Ladner, Jr.*, No. 19-4676, Civil District Court for the Parish of Orleans (May 3, 2019) (the "Morice T.R.O. Motion").[5]

60.     Morice filed the Morice T.R.O. Motion against the following parties:

> (a) Whalen;
> (b) Spizer;
> (c) Ladner's Pools; and
> (d) Theodore A. "Ted" Ladner, Jr.

61.     The Morice T.R.O. Motion specifically identifies Spizer by name and accuses him of engaging in a pattern of stalking, harassing, and intimidating Morice and his family.

62.     The Morice T.R.O. Motion falsely attributes conduct to Spizer, **both individually and jointly with the other named defendants**. It contains the following false and defamatory statements:

> (a)     that Spizer, by name and along with Whalen, engaged in a "pattern of stalking, harassing and intimidating Morice and his family" (Paragraph 31);
>
> (b)     that Spizer, by name and along with Whalen, is generally identifiable as a "known stalker" (Paragraph 20);
>
> (c)     that Spizer, by name and along with Whalen, is receiving a financial benefit from Ladner's Pools, who "paid with the knowledge and instruction to stalk, harass, intimidate and attempt to influence" the Pool Case. (Paragraph 33);
>
> (d)     that Spizer, as a named defendant, "called, harassed and intimidated the contractor doing work for Morice's wife" (Paragraph 22);

---

[4] Morice inserted his La. Bar No. 25949 and law firm name, Morice Law Firm, LLC and address in his signature block.
[5] Attached hereto as Exhibit B.

(e)    that Spizer, as a named defendant, has "further harassed Mr. Morice by contacting his place of employment" (Paragraph 23);

(f)    that Spizer, as a named defendant, is "trying to get Mr. Morice fired and harm his state licensing as a POST certified police officer" (Paragraph 25);

(g)    that Spizer, as a named defendant, has a "financial motivation to continue to stalk, harass, intimidate and harm Mr. Morice and his family members as they are attempting to influence Mr. Morice to drop the [Pool Case]" (Paragraph 29);

(h)    as a named defendant, that Spizer's "only purpose for stalking, harassing and intimidating Mr. Morice and his family is their effort to extra-judicially influence an ongoing case" (Paragraph 32);

(i)    that Spizer, as a named defendant, has "been driving by and/or waiting outside of Mr. Morice's residence for Mr. Morice's wife to exit the house with their children so that Defendants can personally harm Mr. Morice and his wife and children" (Paragraph 37); and

(j)    Morice states that, in connection with the above, he "believes that he and his family's life, safety and health are all in danger by the conspiring defendants" (Paragraph 42).[6]

63.    Spizer was not in the vehicle on April 24, 2019, or at any other time that the vehicle was in the vicinity of the General Diaz Property or any other location mentioned in the allegations of the Morice T.R.O. Motion. Morice is well-aware of this fact, as he personally observed—and stopped—Whalen while she was attempting to drive down a public roadway. Morice even filmed this interaction, clearly showing that Spizer was **not** in the vehicle.

64.    Prior to May 3, 2019, Spizer had **no knowledge** of the facts of the Pool Case, the General Diaz Property, or even Morice's existence.

65.    Spizer has never stalked, harassed, or intimidated anyone and never had any motivation to stalk, harass, or intimidate anyone.

---

[6] *See* Exhibit B.

66.     Upon information and belief, Capt. Wiltz and PPSO, acting under the color of state and local law inappropriately provided information from Whalen's citizen's complaint about Morice to Morice, who is a reserve deputy and legal advisor to PPSO.

67.     Upon information and belief, Morice relied on the information provided to him by Det. Caillouet and Capt. Wiltz to prepare the Morice T.R.O. Motion, which alleged that Whalen spent one hour on the phone with the PPSO "falsely accusing Mr. Morice of scandalous and criminal activity."[7]

68.     Upon information and belief, Morice used this information in his legal action against Whalen, Spizer and the other defendants and violated their civil rights.

69.     Upon information and belief, Morice would not have filed the Morice T.R.O. Motion but for his improper access to (i) the "License Plate Lookup," obtained improperly and under knowingly false pretenses by Det. Caillouet; and (ii)  the recording of Whalen's citizen's complaint, which was improperly disclosed by Capt. Wiltz as a "professional courtesy" to a fellow employee of the PPSO.

70.     Minutes before filing the Morice T.R.O. Motion, Morice transmitted or caused to be transmitted to the "Attn: Sarah Whalen Nuss v. Ladner's et al To be filed Motion for TRO against Whalen Ladners" a copy of the T.R.O. Motion to the fax machine[8]  located in Spizer's law office.

71.     Upon seeing the fax on his office fax machine, Spizer called Morice's office twice, each time leaving an urgent message with Morice's secretary[9] asking Morice to call him in hope

---

[7] See Exhibit B, at ¶¶ 23-25.
[8] See Exhibit C, fax cover sheet.
[9] Morice's secretary, Chloe Mattingly, testified that she Google messaged Morice each time Spizer called and told Morice Spizer had called and had asked Morice to call him. Morice received these messages on his cell phone and sent her a reply prior to his obtaining the Duty Judge's signature on the Order filed with the Morice T.R.O. Motion.

of preventing the Morice T.R.O. Motion from being filed—he was not aware that the T.R.O. Motion had already been filed in the Clerk's Office of the Civil District Court. Nevertheless, and contrary to Louisiana law, Morice with the knowledge that Spizer had called his office twice and had asked that Morice call him, Morice presented the T.R.O. Motion to the Duty Judge over Spizer's objections.

72. Louisiana Law requires that notice and opportunity to be heard be given to parties against which a T.R.O. or preliminary injunction is sought.[10]

73. Despite knowing that Spizer had objections to the T.R.O., Morice failed to give notice to Spizer of his intentions to have the Duty Judge sign the Order filed with the Morice T.R.O. Motion and failed to inform the Court of Spizer's objections.

74. Had Morice told the Duty Judge of Spizer's objections, Spizer's attempts to discuss the T.R.O. with Morice, and Morice's refusal to call Spizer, the Duty Judge would have given Spizer a hearing on the matter and, upon learning that Spizer did not even know Morice or where Morice lived or worked, would have refused to sign the Order for the T.R.O.

75. On May 6, 2019, the Civil District Court for the Parish of Orleans, State of Louisiana issued a "Restraining Order" restraining, enjoining and prohibiting Spizer from "stalking, harassing, intimidating or causing or attempting to cause any and/or performing any abusive acts aimed at harassing petitioner [Morice], petitioner's guests and his employees at his residence or at his contractor's workplace or at his children's school for any reason whatsoever...."[11]

76. Morice's deliberate failure to inform the Court, in an *ex parte* hearing, of material facts known to him that would have enabled the tribunal to make an informed decision led to the

---

[10] *See* La. Code. Civ. P. art. 3603.
[11] *See* Restraining Order, attached hereto as Exhibit D.

unjust result of the Duty Judge improvidently signing an Order authorizing a Restraining Order be issued against Spizer.

## I. DOUBLING DOWN: HAMMEL

77.     On May 9, 2019, Spizer filed his responsive pleading to the Morice T.R.O. Motion, which included Spizer's sworn Affidavit in which he, under oath, denied all of the allegations brought against him by Morice.

78.     The Affidavit includes Spizer's statements that he did not know where Morice lived, that he was not involved in the Pool Case in any way and that he was not present during any of the incidents that Morice claimed involved stalking and/or harassment on the part of Whalen.[12]

79.     Rather than evaluate this information and act accordingly, Morice's response was to make more wild and unfounded accusations against Spizer.

80.     At a May 10, 2019 hearing in open court, Morice chose to **double down** and allow and/or induce his friend, Douglas S. Hammel ("Hammel"), an attorney licensed to practice law in the State of Louisiana who attended the hearing solely in a representative capacity as counsel for Nuss in the Pool Case, to further disseminate and expand the conjecture.[13]

81.     Hammel advised the court that Spizer owned the car involved in the 911 Call and then proceeded to:

    (a)     mischaracterize Spizer as a bankruptcy attorney (a cursory investigation would have revealed this to be untrue);

    (b)     speculate that Spizer was feeding information to Whalen for dissemination into the public record[14];

---

[12] *See* Affidavit of David Bruce Spizer, attached hereto as Exhibit E.
[13] See Exhibit F, transcript of the May 10, 2019 hearing, Page 1, lines 3 – 5 and 12 – 13. See also Exhibit G, email dated May 10, 2019, from Douglas Hammel to Ashley Belleau in which he is asked "Please advise if you are Mr. Morice's attorney in the Morice v. Whalen action" to which he replies, "I do represent Heidi Nuss in the matter against Ladner Pools;" and Exhibit H, email dated September 24, 2019, in which Douglas Hammel informs attorney Greg Noto, "I do not represent Mr. Morice in the TRO. Therefore, please do not include me in any correspondence regarding this matter."
[14] *See* Exhibit F, Page 13, lines 9-14.

(c)     announce that "[Morice] fears for himself. He has no idea who this person is and what they have been doing is completely unprofessional and irresponsible. That's the purpose of why the TRO was filed both against Mr. Spizer - - this is the best part, Judge, he did get notice."[15]

82.     Hammel and the Hammel Law Firm, LLC did not represent Morice in the Pool Case. Rather, Morice—who is an attorney—represented himself.[16]

83.     Accordingly, Hammel's statements in open court were neither protected by any privilege nor made in reliance on a client's statements.

### J. TRIPLING DOWN: MORICE'S Rule for Sanctions and Finding of Contempt

84.     On May 16, 2019, Morice **tripled-down** and continued his unwarranted attack on Spizer by filing a *Rule for Sanctions and Finding of Contempt* against Spizer, in which he falsely accused Spizer of violating the TRO, being in contempt of Court and intentionally misleading the Court.

85.     Specifically, Morice claimed that Spizer was in contempt of Court for violating the TRO by calling Morice's office after receiving the T.R.O. Motion.

86.     Spizer called Morice's office on May 3, 2019, <u>prior</u> to the Order being presented to and signed by the Duty Judge, and — <u>prior</u> to the issuance of the Morice T.R.O. by the Court on May 6, 2019. The T.R.O. had not yet been issued, much less served upon Spizer. Morice's statement was yet another in a continual string of knowing falsehoods he made to the Civil District Court with actual malice as part of his vendetta against Spizer.

### K. QUADRUPLING DOWN: MORICE'S Opposition to Exceptions to Dissolve Restraining Order and for Sanctions

87.     On May 22, 2019, Morice **quadrupled down** on his false allegations and filed a

---

[15] *See* Exhibit F, Page 13, lines 23-28.
[16] See Exhibit F, Page 19, lines 4-11.

pleading against Spizer titled *Opposition to Exceptions to Dissolve Restraining Order and for Sanctions* (the "Morice Opposition")[17] in the Morice T.R.O. Motion, in which Morice made additional false and defamatory accusations against Spizer.

88.     As part of his second phone call to Morice's office on May 3, 2019 to register his objection to the filing of the Morice T.R.O. Motion, Spizer stated that Morice would be "in trouble" (meaning legal trouble) if he filed the T.R.O. Motion that falsely accused Spizer of criminal conduct without personal knowledge of supporting information or a reasonable belief thereof.

89.     In the Morice Opposition, Morice transparently mischaracterizes this statement as a threat and rhetorically asks: "What type of 'trouble' is Mr. Spizer referring to in a threatening tone? Will he hit Morice with a bat? Shoot Morice with a gun? Lay in wait outside of Mr. Morice's home or at his workplace?"[18]

90.     In doing so, Morice falsely implies that Spizer is a violent person prone to attacking another person with a baseball bat, shooting a person with a gun, and lying in wait outside a person's home or workplace.

91.     Having run out of innocent statements to intentionally misconstrue, Morice unabashedly offered an outright lie instead. Morrice alleged: "Defendants have intentionally and repeatedly followed or harassed Plaintiff and caused him to feel alarmed and emotional distress...as a result of verbal, written, or behaviorally implied threats of death, bodily injury, kidnaping, and other statutory criminal acts to himself and members of his family."[19]

92.     Morice's language was lifted nearly verbatim from La. R.S. § 14:40.2, Louisiana's criminal statute on stalking. This was a vain attempt to create and describe a crime where there was none.

---

[17] Attached hereto as Exhibit I.
[18] *See* Exhibit I, Unnumbered Pages 9-10 (Morice failed to number the pages in this pleading).
[19] See Exhibit I, Unnumbered Page 13.

## V. LAW AND ARGUMENT

### A. COUNT 1: VIOLATIONS OF 42 U.S.C. § 1983

93.     "To state a claim for relief in an action brought under § 1983, respondents must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."[20]

94.     Det. Caillouet and Capt. Wiltz, acting individually under the color of state and local law, violated federal law and deprived Spizer of the protections guaranteed to him under the Constitution and the laws of the United States.

95.     Det. Caillouet violated Spizer's privacy and due process rights by obtaining the License Plate Lookup under knowingly false pretenses, and further, by providing that information to Morice.  Spizer now sues Det. Caillouet, individually, under 42 U.S.C. § 1983.

96.     Capt. Wiltz violated Spizer's privacy and due process rights by transmitting to Morice information about Whalen's citizen's complaint and a recording of his conversation with Whalen that was ultimately used to manufacture baseless claims and a suit against Spizer. Spizer now sues Capt. Wiltz, individually, under 42 U.S.C. § 1983.

### B. COUNT 2: VIOLATIONS OF 18 U.S.C. § 2721 – DRIVER'S PRIVACY PROTECTION ACT

98.     18 U.S.C. § 2721 prohibits the disclosure and redisclosure of personal information, including name and address, as retrieved from the State motor vehicle records except for a certain list of in enumerated "permissible uses."

99.     Furthermore, 18 U.S.C. § 2722, declares that:

(a)     "It shall be unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) of this title"; and

---

[20] *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S. Ct. 977, 985, 143 L. Ed. 2d 130 (1999).

(b)     "It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record."

100.    Det. Caillouet individually violated:

(a)     18 U.S.C. § 2721(c) by redisclosing the information derived from the License Plate Lookup to Morice.

(b)     18 U.S.C. § 2722(a) by conducting the License Plate Lookup in the absence of a permissible use; and

(c)     18 U.S.C. § 2722(b) by **falsely representing** that a "hit and run" had occurred to justify the License Plate Lookup.

101.    Morice individually violated 18 U.S.C. § 2722(a) and (b) by obtaining and using the information derived from the License Plate Lookup in the absence of a permissible use and by making a **false representation** to obtain said information.

102.    Det. Caillouet's statement that the vehicle was involved in a "hit and run" was a false representation because he knew that the vehicle was not involved in a "hit and run." Neither Det. Caillouet, nor any other law enforcement officer investigated or took any other action with respect to this fictitious "hit and run."

103.    Further, Morice knew that the vehicle was not involved in a "hit and run." He never reported a "hit and run" to the 911 operator, never mentioned a "hit and run" in any of the numerous pleadings he filed against Mr. Spizer in the T.R.O. action, and never mentioned a "hit and run" in his deposition taken in the Morice T.R.O. action.

104.    By making the false representation of a non-existent "hit and run" to obtain the personal information from Whalen and Spizer's motor vehicle record, Morice and Det. Caillouet violated 18 U.S.C. § 2722(b), which provides that "It shall be unlawful for any person to make false representation to obtain any personal information from an individual's motor vehicle record." The making of the false representation that the motor vehicle was involved in a "hit and run" and

18

entering such known-to-be-false information into the NOPD computer to obtain personal information from a motor vehicle record and then entering such known-to-be-false information into a police report was a willful and reckless disregard of the law on the part of Det. Caillouet and Morice.

105.     "A person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains, who may bring a civil action in a United States district court." 18 U.S.C. § 2724. Accordingly, Spizer now brings this civil action.

### C. COUNT 3: DEFAMATION

106.     Morice falsely accused Spizer of criminal conduct and published these falsehoods to the public at large.

107.     These baseless allegations made and disseminated by Morice are severely injurious to Spizer's reputation as a citizen of New Orleans and as an attorney sworn to uphold the law. Under Louisiana law, there are four elements necessary to establish a claim for defamation:

> (a)     "a false and defamatory statement concerning another;"
>
> (b)     "an unprivileged publication to a third party;"
>
> (c)     "fault (negligence or greater) on the part of the publisher;" and
>
> (d)     "resulting injury."[21]

108.     "In Louisiana, defamatory words have traditionally been divided into two categories: those that are defamatory per se and those that are susceptible of a defamatory meaning."[22]

109.     "Words which **expressly or implicitly accuse another of criminal conduct**, or

---

[21] *Kennedy v. Sheriff of E. Baton Rouge*, 05-1418 (La. 7/10/06), 935 So. 2d 669, 674.
[22] *Kennedy,* 935 So. 2d at 674–75; *Costello v. Hardy*, 03-1146 (La. 1/21/04), 864 So. 2d 129, 140.

which by their very nature tend to **injure one's personal or professional reputation**, even without considering extrinsic facts or surrounding circumstances, are considered defamatory per se."[23]

110.    "When a plaintiff proves publication of words that are defamatory per se, falsity and malice (or fault) are presumed, but may be rebutted by the defendant. Injury may also be presumed."[24]

111.    Morice's statements included that Spizer engaged in a "pattern of stalking, harassing and intimidating Morice and his family," which is defamatory *per se* as it expressly accuses Spizer of the crime of stalking and by its very nature injures Spizer's personal and professional reputation.

112.    Because Morice's statement was defamatory per se, falsity, malice, and injury are presumed.[25]

113.    By making his false and defamatory statements concerning Spizer in pleadings filed into the public record, Morice has made unprivileged publications to multiple third parties.[26]

114.    Morice's false statements have irreparably damaged Spizer's reputation as an upstanding citizen and a licensed attorney.

115.    These statements have jeopardized his ability to garner the trust of his clients and have thereby jeopardized his livelihood.

116.    Further, these false statements are obstacles to any public office or position to which Spizer may aspire.

---

[23] *Costello*, 864 So. 2d at 140.
[24] *Kennedy*, 935 So. 2d at 675.
[25] Even if these elements were not presumed, Morice's actions demonstrate negligence or reckless disregard for the truth. Morice made these false and defamatory statements against Spizer without having **any personal knowledge** or information of the alleged conduct by Spizer. None of these allegations can be considered to have been based upon **reasonable** belief as Morice conducted **absolutely no inquiry** into whether Spizer had engaged in any of the alleged conduct after learning that Spizer's name was on the title to a vehicle that allegedly stalked him.
[26] *See Costello*, 864 So. 2d at 146.

117.   Spizer has incurred significant expenses in defending himself against these false and baseless claims.

### D. COUNT 4: ABUSE OF PROCESS

118.   Morice willfully abused the legal process by seeking and obtaining a TRO against Spizer and others for an ulterior purpose.

119.   Specifically, Morice sought a TRO against Spizer and others purportedly to protect Morice and his family from stalking, harassment, intimidation, when, in fact, no such conduct was occurring or was ever threatened.

120.   Because no such conduct was occurring or threatened, Morice was motivated by ulterior purposes, including, but not limited to:

(a)   to oppress, damage, humiliate, vex, and/or spite Spizer;

(b)   to procure leverage or an advantage in the Pool Case;

(c)   to punish any and all parties that Morice believed may have been responsible for Ladner's refusal to build Morice and Nuss a $110,000 swimming pool for a greatly reduced price;

(d)   to obtain revenge against any and all parties responsible for uncovering public records indicating that Morice and Nuss had IRS liens in excess of $1.12 million dollars for unpaid income taxes, and as a result, they could not afford a pool costing $110,000; and

(e)   to punish any and all parties for bringing, and refusing to withdraw, evidence offered in the Pool Case.

121.   Morice, motivated by a perceived wrong, chose to wield a legal shield as a sword. Morice sought and obtained a result that was not proper under the law and, as a learned attorney, did so knowingly. He maliciously misused and misapplied this process.

122.   To this end, Morice, under false pretenses, improperly obtained information from the NOPD and PPSO, who were aware of and complicit in Morice's ulterior purposes. Further,

Morice procured the false representations made in open court by Hammel, who willing gave the same.

123.    Spizer was severely injured by Morice's abuse of process, financially and emotionally: he was forced to defend himself against this abuse of process and incur legal fees, divert resources from his own legal practice, and endure the accompanying trauma.

124.    Spizer's claim for abuse of process is not premature and has fully ripened because there was bona fide termination in favor of Spizer, who was dismissed with prejudice by Morice. Morice attempted to file a First Supplemental and Amended Petition. The Civil District Court struck from the pleading any reference to a request for a Temporary Restraining Order and Preliminary Injunction. Morice's Claims for the TRO and Preliminary Injunction have been dismissed by the court.

### E. COUNT 5: ABUSE OF RIGHT

125.    Morice committed an abuse of right when he carried out the above-identified conduct including, but not limited to, calling emergency services and causing the entry of a "hit and run" report despite the absence thereof, seeking and obtaining the Morice TRO, seeking contempt of court against Spizer, and acquiring information about and the recording of Whalen's citizen's complaint to the PPSO.

126.    With respect to Morice's exercise of these rights:

   (a)    his predominant motive for the exercise of these rights was to cause harm;
   (b)    there was no serious or legitimate motive for the exercise of these rights;
   (c)    the exercise of these rights violated moral rules, good faith, and elementary fairness; and
   (d)    the exercise of the rights was for a purpose other than for which they were granted.

127.    Upon information and belief, Det. Caillouet, Capt. Wiltz, and Hammel knowingly

and willingly assisted Morice in committing this abuse of right.

128.    Spizer's claim for abuse of right is not premature and has fully ripened because there was bona fide termination in favor of Spizer, who was dismissed by Morice. Morice attempted to file a First Supplemental and Amended Petition. The Civil District Court struck from the pleading any reference to a request for a Temporary Restraining Order and Preliminary Injunction. Morice's Claims for the TRO and Preliminary Injunction have been dismissed by the court.

### F. COUNT 6: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

129.    Morice committed Intentional Infliction of Emotional Distress ("IIED") against Spizer by seeking and obtaining a temporary restraining order against him on false and defamatory grounds and by continuing to pursue and promulgate these claims in the public arena despite knowing they were false.

130.    Morice's above-described conduct, including, but not limited to, his lodging of patently false and defamatory criminal allegations to pursue a temporary restraining order, seeking enforcement of that temporary restraining order, seeking contempt for fabricated violations of that temporary restraining order, was **extreme and outrageous**.

131.    Spizer has suffered and will continue to suffer severe emotional distress from these groundless assaults on his character.

132.    At the very least, Morice, as a learned and licensed attorney, **knew** that it was likely or certain that Spizer would suffer emotional distress as a result of his conduct. However, as demonstrated by Morice's pattern of behavior, it is apparent that **Morice intended** for Spizer to suffer severe emotional distress.

133.    Upon information and belief, and as described above, Det. Caillouet, Capt. Wiltz, and Hammel, knowingly and willingly assisted the exaction of Morice's retribution against Spizer.

134.    Accordingly, Morice, Det. Caillouet, Capt. Wiltz, and Hammel, are liable for the IIED against Spizer in relative shares to be determined in accordance with either: (a) comparative fault under La. Civ. Code art. 2323; or (b) as solidary or joint tortfeasors under La. Civ. Code art. 2324.

### G. COUNT 7: MALICIOUS PROSECUTION

135.    Morice committed the tort of malicious prosecution by seeking a temporary restraining order against Spizer without probable cause, pursuing its enforcement, and zealously maintaining the action before seeking its dismissal.

136.    Spizer incurred significant financial and emotional injuries as a result of Morice's actions including, but not limited to, damage to his reputation, expenses incurred as a result of his defense, lost business opportunities, and psychological trauma.

### H. COUNT 8: GENERAL TORT LIABILITY

137.    Under Louisiana law, the fountainhead of tort liability is La. Civ. Code art. 2315, which provides "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

138.    Spizer has been damaged by the Defendants' tortious conduct hereinabove described.

139.    In addition to the above Counts, each of the Defendants is liable to repair the damages sustained by Spizer as a result of their tortious conduct.

### I. COUNT 9: VICARIOUS LIABILITY AND INSURANCE COVERAGE

140.    The City of New Orleans is vicariously liable for Det. Caillouet's tortious conduct

(Counts 3-8 made pursuant to state law) identified in this Complaint because Det. Caillouet was acting within the course and scope of his employment at the time he committed these wrongs.

141.    Gerald A. Turlich, Jr., as Sheriff of Plaquemines Parish, upon information and belief, is vicariously liable for Morice's tortious activity (Counts 3-8 made pursuant to state law) identified in this Complaint because Morice was acting within the course and scope of his employment at the time he committed these wrongs.

142.    Gerald A. Turlich, Jr., as Sheriff of Plaquemines Parish, is vicariously liable for Capt. Wiltz's tortious activity (Counts 3-8 made pursuant to state law) identified in this Complaint because Capt. Wiltz was acting within the course and scope of his employment at the time he committed these wrongs.

143.    Upon information and belief, Morice's lawyers' professional liability insurance coverage was arranged for by Gilsbar, L.L.C., a Louisiana limited liability company domiciled in the Parish of St. Tammany ("Gilsbar"), with Morice having professional liability insurance provided by Continental Casualty Company, Inc., a subsidiary of CNA, a corporation domiciled in Chicago, Illinois ("Continental Casualty"). Accordingly, Gilsbar and Continental Casualty may be liable in whole or in part for the damages caused by Morice.

144.    Upon information and belief, Hammel's lawyers' professional liability insurance coverage was arranged for by Gilsbar, with Hammel having professional liability insurance provided by Continental Casualty. Accordingly, Gilsbar and Continental Casualty may be liable in whole or in part for the damages caused by Hammel.

## VI. CONCLUSION

145.    While Morice falsely painted himself as the victim of a pattern of stalking, harassment and intimidation by Spizer, it is Morice who has engaged in a pattern of harassment

and character assassination against Spizer, a person wrongly accused by Morice of stalking solely because he bought his girlfriend, Whalen, a car.

146.    Upon learning that Spizer was not involved in any of the conduct alleged to be stalking and harassment, Morice failed to immediately mitigate the damages by admitting he was wrong and dismissing Spizer from the Morice T.R.O. action.

147.    Instead, he stubbornly continued making false and defamatory statements against Spizer.

148.    Morice's conduct is particularly egregious as it was directed at a fellow attorney who did not know Morice or where he lives and is not involved in any manner in the Pool Case that motivated Morice to bring the action in the first place.

149.    Morice has caused Spizer significant financial harm as Spizer was forced to hire an attorney to defend him against the serious defamatory and criminal allegations brought by Morice and to work towards fashioning a legal remedy to mitigate the damage done to Spizer's reputation by Morice's reckless and malicious actions.

150.    In addition, Spizer has spent a significant amount of time assisting counsel with the preparation of pleadings, reviewing documents and developing a strategy to extricate himself from the reckless mess that Morice has so callously created. This has drawn time away from Spizer's own law practice, causing additional financial harm.

151.    The serious and disgusting false allegations brought against Spizer by Morice have tarnished Spizer's impeccable reputation and disrupted Spizer's personal life causing him mental anguish and emotional distress and adversely affecting his quality of life.

152.    Morice brought the Morice T.R.O. action during and in furtherance of his representation, as an attorney licensed to practice law in the State of Louisiana, of Heidi Nuss in

the Pool Case, hoping to gain a tactical advantage in the case by having the Court issue a TRO against the defendants that would, in effect, severely restrict Whalen's ability to conduct discovery.

153.   His actions were also designed to gain tactical advantages in the Pool Case and push Ladner's Pools and Ted Ladner to capitulate to Morice's demands in the Pool Case.

## PRAYER FOR RELIEF

**WHEREFORE**, David Bruce Spizer requests that the Defendants hereinabove named be cited to appear and answer, and that on final trial this Honorable Court:

1.   Find that Det. Roger Caillouet and Capt. Wiltz individually deprived Spizer of a civil right in violation of 42 U.S.C. § 1983;

2.   Find that Det. Roger Caillouet and Mark E. Morice individually violated the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-2725, specifically § 2722(a), (b) and (c);

3.   Find that Det. Caillouet' s false statement that the motor vehicle co-registered in the name of the Plaintiff was involved in the criminal act of "hit and run" and which was published into public records constitutes defamation per se;

4.   Find that Mark E. Morice's false statements that Spizer engaged in criminal conduct including stalking, harassing, intimidating Morice and his family and other inappropriate behavior constitute defamation per se with Gilsbar, L.L.C. and Continental Casualty Company, Inc. being responsible for the consequences of Mark E Morice's actions to the extent they provide lawyers' professional liability insurance coverage to Morice;

5.   Find that Douglas S. Hammel's false statements, including that Spizer engaged in "completely unprofessional and irresponsible conduct," are defamatory with Gilsbar, L.L.C. and Continental Casualty Company, Inc. being responsible for the

consequences of Douglas S. Hammel's actions to the extent they provide lawyers' professional liability insurance coverage to Hammel;

6.  Order the City of New Orleans and the NOPD to permanently remove from their records the false statement that the vehicle co-registered to the Plaintiff was involved in a "hit and run;"

7.  Enter judgment against the defendants for actual damages, including, but not limited to attorney's fees and other litigation costs incurred by the Plaintiff in the Morice T.R.O. action, lost income resulting from time spent defending against the Morice T.R.O. action, damage to Plaintiff's reputation and mental anguish and emotional distress, suffered by Plaintiff due to the actions of Defendants in the amount of $500,000 to be allocated among the Defendants as the Court deems appropriate;

8.  Enter judgment against Det. Roger Caillouet and Mark E. Morice for punitive damages in the amount of $500,000.00 for their willful and reckless disregard of the law as provided by 18 U.S.C. § 2724(b)(2);

9.  Find that Morice, assisted by the NOPD, PPSO, and Hammel, committed an abuse of process under Louisiana law and enter an award of damages in favor of Spizer;

10.  Find that Morice, assisted by Det. Caillouet, Capt. Wiltz, and Hammel, committed an abuse of right under Louisiana law and enter an award of damages against them in favor of Spizer;

11.  Find that Morice, assisted by Det. Caillouet, Capt. Wiltz, and Hammel, committed intentional infliction of emotional distress against Spizer and enter an award of damages against them in favor of Spizer;

12.  Find that Morice committed malicious prosecution and enter an award of damages

28

against him in favor of Spizer;

13.    Find that the Defendants are liable for their tortious conduct under La. Civ. Code art. 2315 and enter an award of damages against them in favor of Spizer;

14.    Find that the City of New Orleans is vicariously liable for the tortious conduct (Counts 3-8 made pursuant to state law) of Det. Caillouet;

15.    Find that Sherriff Gerald Turlich, Jr. is vicariously liable for the tortious conduct (Counts 3-8 made pursuant to state law) of Morice and Capt. Wiltz;

16.    Find that Gilsbar and Continental Casualty Company are answerable in whole or in part for the conduct of their insureds;

17.    For attorney's fees and other litigation costs incurred by the Plaintiff in this action to be allocated among the Defendants, pursuant to 42 U.S.C. §§ 1983 and 1988, and 18 U.S.C. §2724(b)(3), and/or other statutory bases as the Court deems appropriate; and

18.    For such other relief, equitable or otherwise, to which the Plaintiff may be entitled.

Respectfully Submitted:
**LUGENBUHL, WHEATON, PECK,
RANKIN & HUBBARD, PLC**

*/s/ Ryan M. Tucker*
Ashley L. Belleau, La. Bar No. 14077
Joseph P. Briggett, La. Bar No. 33029
Ryan M. Tucker, La. Bar No. 38922
601 Poydras Street, Suite 2775
New Orleans, LA 70130
Telephone: (504) 568-1990
Facsimile: (504) 310-9195
abelleau@lawla.com
jbriggett@lawla.com
rtucker@lawla.com
**ATTORNEYS FOR DAVID BRUCE SPIZER**